**RICHARD R. BEST**
**REGIONAL DIRECTOR**
**Sanjay Wadhwa**
**Sheldon L. Pollock**
**John O. Enright**
**Lee A. Greenwood**
**Lindsay S. Moilanen**
**Attorneys for Plaintiff**
**SECURITIES AND EXCHANGE COMMISSION**
**New York Regional Office**
**Brookfield Place**
**200 Vesey Street, Suite 400**
**New York, New York 10281-1022**
**212-336-1060 (Greenwood)**
**GreenwoodL@sec.gov**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br><br>                              **Plaintiff,**<br><br>          -against-<br><br>**LEV PARNAS and**<br>**DAVID CORREIA,**<br><br>                              **Defendants.** | **COMPLAINT**<br><br>**21 Civ. 995**<br><br><br>**JURY TRIAL DEMANDED** |

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against

Defendants Lev Parnas ("Parnas") and David Correia ("Correia") (collectively, "Defendants"),

alleges as follows:

## SUMMARY

1.     This civil enforcement action concerns an investment offering fraud perpetrated by

Defendants, through which they raised more than $2 million from investors for their company,

Fraud Guarantee, but which they used instead to pay for lavish personal expenses unrelated to the

company.

2.      Fraud Guarantee purported to develop products that would help customers recoup losses resulting from investment fraud or consumer fraud.  Fraud Guarantee never became operational and has never actually sold any such products.

3.      From 2013 through the middle of 2019, Defendants solicited dozens of individuals located across the country and internationally to invest in the securities of Fraud Guarantee—either equity interests in the various companies through which Defendants ran Fraud Guarantee or notes that investors could convert into such equity interests.

4.      In marketing materials, emails, and oral discussions, Defendants told potential investors in Fraud Guarantee that their money would be used to fund the business expenses of the company.  Defendants also represented to potential investors that they had raised millions of dollars from other investors—including as much as $5 million by 2018—and that they had personally invested hundreds of thousands of dollars of their own money into the company.  These representations were false.  In fact, since 2013, Defendants misappropriated the majority of the investor funds they raised for Fraud Guarantee to pay for personal expenses such as travel, luxury goods, and untraceable cash withdrawals.  Defendants also only raised less than half of the funds they told investors they had raised, none of which they themselves had invested.

5.      Today, Fraud Guarantee is defunct and the membership interests held by these investors are effectively worthless.

6.      Through their work soliciting investors in Fraud Guarantee, Defendants also acted unlawfully as brokers, since they were not registered as such with the Commission during the relevant period.

**VIOLATIONS**

7.       By virtue of the foregoing conduct and as alleged further herein, Defendants Parnas and Correia have violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)] and Sections 10(b) and 15(a) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78j(b) and 78o(a)] and Rule 10b-5 promulgated thereunder [17 C.F.R. § 240.10b-5].

8.       Unless Defendants are restrained and enjoined, they will engage in the acts, practices, transactions, and courses of business set forth in this Complaint or in acts, practices, transactions, and courses of business of similar type and object.

**NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT**

9.       The Commission brings this action pursuant to the authority conferred upon it by Securities Act Sections 20(b) and 20(d) [15 U.S.C. §§ 77t(b) and 77t(d)] and Exchange Act Section 21(d) [15 U.S.C. § 78u(d)].

10.       The Commission seeks a final judgment: (a) permanently enjoining Defendants from violating the federal securities laws and rules this Complaint alleges they have violated; (b) ordering Defendants to disgorge the ill-gotten gains they received with prejudgment interest thereon pursuant to 15 U.S.C. § 78u(d)(5) and Sections 6501(a)(1) and (a)(3) of the National Defense Authorization Act for Fiscal Year 2021, Pub. L. No. 116-283, to be codified at 15 U.S.C. §§ 78u(d)(3) and 78u(d)(7); (c) ordering Defendants to pay civil money penalties pursuant to Securities Act Section 20(d) [15 U.S.C. § 77t(d)] and Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)]; and (d) ordering any other and further relief the Court may deem just and proper.

**JURISDICTION AND VENUE**

11.       This Court has jurisdiction over this action pursuant to Securities Act Section 22(a) [15 U.S.C. § 77v(a)] and Exchange Act Section 27 [15 U.S.C. § 78aa].

12.     Defendants, directly and indirectly, have made use of the means or instrumentalities of interstate commerce or of the mails in connection with the transactions, acts, practices, and courses of business alleged herein.

13.     Venue lies in this District under Securities Act Section 22(a) [15 U.S.C. § 77v(a)] and Exchange Act Section 27 [15 U.S.C. § 78aa].  Defendants met with and solicited potential investors in Fraud Guarantee in the Southern District of New York, Fraud Guarantee maintained an office in Manhattan from approximately 2015 until approximately 2017, and certain of the acts, practices, transactions, and courses of business alleged in this Complaint occurred within this District, including the routing of investor funds through banks located in Manhattan, the use of investor funds to pay a consulting firm based in Manhattan, and the use of investor funds to pay personal expenses to vendors located in this District, including clothing stores and hotels.

## DEFENDANTS[1]

14.     **Parnas**, age 48, resides in Boca Raton, Florida.  Parnas was a founder, president, and chief executive officer of Fraud Guarantee.  On September 17, 2020, Parnas was criminally charged in a superseding indictment by the U.S. Attorney's Office for the Southern District of New York (the "USAO SDNY") with, among other charges, conspiracy to commit wire fraud in connection with the Fraud Guarantee scheme described herein.  *See United States v. Parnas et al.*, 19 Cr. 725 (JPO) (S.D.N.Y.) (the "Criminal Case").  From approximately 1993 to 2009, Parnas was a registered representative associated with more than ten different Commission-registered broker-dealers, where he held, at various times, Series 7, 24, and 63 licenses.  Since 2009, Parnas has not been licensed or registered as a broker-dealer or as an associated person of a broker-dealer and he has not registered any entity he owns or controls with the Commission as a broker-dealer.

---

[1]     Correia entered into a tolling agreement with the Commission for the period December 1, 2020 to June 1, 2021.

15.     **Correia**, age 45, resides in West Palm Beach, Florida.  Correia was a founder and chief operating officer of Fraud Guarantee.  Correia has also been charged by the USAO SDNY in the superseding indictment in the Criminal Case with, among other charges, conspiracy to commit wire fraud in connection with the Fraud Guarantee scheme described herein.  On October 29, 2020, Correia pled guilty in the Criminal Case to both the Fraud Guarantee charge and another charge and is currently awaiting sentencing.  Correia has never been licensed or registered as a broker-dealer or as an associated person of a broker-dealer and he has never registered any entity he owns or controls with the Commission as a broker-dealer.

## FACTS

## I.     BACKGROUND ON FRAUD GUARANTEE

16.     Defendants founded Fraud Guarantee in or about 2012.  Fraud Guarantee is a Delaware limited liability company with its principal place of business in Boca Raton, Florida.

17.     Between 2012 and 2019, Fraud Guarantee purported to develop various products that could allow customers to either identify investment fraud or recoup investment or consumer losses resulting from fraud.

18.     Fraud Guarantee touted these products in its marketing materials and business plans, which Defendants prepared, reviewed, and distributed to potential investors.

19.     According to these materials, "Fraud Guarantee was born from our dissatisfaction with the billions of dollars lost every year due to investment fraud."

20.     Fraud Guarantee purported to develop an "insurance product" it called "Invest-Safe"—the company's "main product"—that would supposedly protect policyholders from investment losses resulting from "criminal fraud."  Fraud Guarantee stated in its business plans that it intended to work with a "top insurance underwriter" to develop this product, which it called "the only fraud insurance policy for the investment community."

21.     Fraud Guarantee purported to develop another product it called "FRAUDalert" that could identify potential investment risks by searching "social media and blog sites for any negative/positive comments about a specific company, fund or individual."

22.     Fraud Guarantee also purported to develop a product it called "PurchaseProtect" that would provide consumer fraud protection, as well as protection against accidental theft or damage, for consumers who made various types of purchases and who paid a monthly fee.

23.     Fraud Guarantee never became operational, it never completed the development of any of these products, it never sold any of these products to customers, and it never generated any revenue.

24.     In fact, Fraud Guarantee did not even take basic steps like securing the trademarks for the product names Invest-Safe, FRAUDalert, or PurchaseProtect.

25.     Nevertheless, in the business plans that Defendants provided to potential investors, Defendants represented that Fraud Guarantee would use investor funds as the necessary working capital to build the business and that the company needed to raise $3.5 million to execute the first phase of its business model.

26.     The Fraud Guarantee business plans that Defendants provided to potential investors also indicated that the prior investments in the company had been used to fund legitimate business expenses.

27.     Over time, Defendants ran Fraud Guarantee through at least three limited liability companies.

28.     From approximately 2012 through at least 2013, Defendants ran Fraud Guarantee through Strategic Global Assets, LLC ("Strategic"), a Florida limited liability company with its principal place of business in Palm Beach Gardens, Florida.

29.     From approximately 2013 through at least 2016, Defendants ran Fraud Guarantee through Fraud Guarantee, LLC, a Delaware limited liability company with its principal place of business in Boca Raton, Florida.

30.     From approximately 2015 through at least 2019, Defendants ran Fraud Guarantee through Fraud Guarantee Holdings, LLC, another Delaware limited liability company with its principal place of business in Boca Raton, Florida.

31.     Fraud Guarantee also maintained an office in Manhattan from approximately 2015 until approximately 2017, to which Defendants traveled and from which a Fraud Guarantee employee drafted and sent updates to investors at Defendants' direction.

## II.   DEFENDANTS SOLICITED POTENTIAL INVESTORS IN FRAUD GUARANTEE AND SOLD THEM FRAUD GUARANTEE SECURITIES

32.     Between 2013 and 2019, Defendants identified and solicited dozens of individuals to invest in Fraud Guarantee.  These individuals were located in at least four states—Alabama, Georgia, Florida, and New York—and in Israel.

33.     To obtain their investments, Defendants contacted potential investors by phone and email, they met with investors across the United States, and they provided investors with copies of Fraud Guarantee business plans and other marketing materials.

34.     Defendants also described for investors the terms of the various Fraud Guarantee securities offerings (which changed over time), they provided investors with copies of the relevant convertible notes, subscription documents, and other agreements that memorialized the terms of their investments, they collected copies of these signed agreements and documents, and they provided instructions to investors on where (*i.e.*, which bank account) and how (*i.e.*, wire transfer or check) to remit their money.

35.     The Fraud Guarantee business plans advised potential investors that "[a] convertible note is the preferred vehicle of management to raise investment capital."

36.     In a letter on the second page of the Fraud Guarantee business plans, from Parnas as a founder and the chief executive officer of the company, Parnas stated that the purpose of the business plan was "to provide investors with the information necessary to make an informed investment decision."  Parnas also stated in the letter that "[w]e are very confident that Fraud Guarantee will be a major success as well as a wise investment."

37.     The Fraud Guarantee business plans advised that Parnas "is the lead executive tasked with managing the fund-raising process."

38.     To that end, the Fraud Guarantee business plans touted Parnas's background and experience working in the securities industry.

39.     Specifically, Parnas's biography in the Fraud Guarantee business plans stated:

> Mr. Parnas moved into the securities industry and founded a brokerage firm that eventually became the fifth largest wholesale-market maker in the United States, employing over 200 traders.  Mr. Parnas' firm made markets for over 4,500 stocks, and took over 1000 companies public.  As a licensed financial professional for over twenty years, Mr. Parnas is proud of the fact that he enjoyed that tenure without a single professional complaint against his license or business. . . .  Mr. Parnas' background was the catalyst for Fraud Guarantee. After seeing the best and the worst of the financial industry, especially the problems caused by investor fraud, of which he himself was a victim, Mr. Parnas decided his next business venture would be protecting other investors from losses due to fraud.

40.     The Parnas biography in the Fraud Guarantee business plans does not mention that Parnas stopped being a licensed broker in approximately 2009, several years before he and Correia founded Fraud Guarantee.

41.     As a result of Defendants' solicitation of investors, Defendants raised more than $2 million from investors for Fraud Guarantee, including from the seven investors described below.

**A.     Investor-1**

42.     In January, February, and July 2013, Investor-1 and Fraud Guarantee entered into three separate convertible notes with principal balances of $100,000, $150,000, and $200,000,

respectively.  Investor-1 actually invested approximately $400,000 in Fraud Guarantee over the course of 2013 pursuant to these convertible notes; Investor-1 does not appear to have fully funded all three notes.

43.     Each of these convertible notes purported to accrue interest on the principal balances at an annual rate of 8%.

44.     Each of these convertible notes provided terms by which Investor-1 was entitled to convert the remaining balance of the note into membership interests in Fraud Guarantee (at the time, Strategic).

45.     Finally, each of these convertible notes stated on their first page that the notes were not registered with the Commission pursuant to the Securities Act or any state securities laws.

46.     Parnas signed the first convertible note on behalf of Fraud Guarantee, whereas Correia signed the second and third convertible notes on behalf of Fraud Guarantee.

47.     Defendants spoke and emailed with Investor-1 about the investment opportunity and provided Investor-1 with the payment information for a Strategic bank account ("Account-1") to which Investor-1 sent Investor-1's investments in Fraud Guarantee.

48.     Defendants both had signatory authority for Account-1.

49.     Correia, copying Parnas, emailed a copy of a business plan for Fraud Guarantee to Investor-1 on September 26, 2013.  This business plan contained each of the statements attributed to Fraud Guarantee's business plans described in this Complaint.

50.     In 2016, Investor-1 converted the convertible notes into membership interests in Fraud Guarantee Holding, LLC.  Thereafter, Correia sent Investor-1 an Internal Revenue Service ("IRS") Schedule K-1 for 2017 and 2018, which set forth Investor-1's ownership stake in Fraud Guarantee.

**B.    Investor-2**

51.    In February and May 2013, Investor-2 and Fraud Guarantee entered into two separate convertible notes with principal balances of $50,000, and $100,000, respectively.  Investor-2 invested approximately $150,000 in Fraud Guarantee over the course of 2013 pursuant to these convertible notes.

52.    Each of these convertible notes purported to accrue interest on the principal balance at an annual rate of 8%.

53.    Each of these convertible notes provided terms by which Investor-2 was entitled to convert the remaining balance of the note into membership interests in Fraud Guarantee (at the time, Strategic).

54.    Finally, each of these convertible notes stated on the first page that the notes were not registered with the Commission pursuant to the Securities Act or any state securities laws.

55.    Correia signed both convertible notes on behalf of Fraud Guarantee.

56.    Defendants spoke and emailed with Investor-2 about the investment opportunity and provided Investor-2 with the payment information for Account-1 to which Investor-2 sent Investor-2's investments in Fraud Guarantee.

57.    Correia, copying Parnas, emailed a copy of a business plan for Fraud Guarantee to Investor-2 on September 26, 2013.  This business plan contained each of the statements attributed to Fraud Guarantee's business plans described in this Complaint.

58.    In 2016, Investor-2 converted the convertible notes into membership interests in Fraud Guarantee Holding, LLC.  Thereafter, Correia sent Investor-2 an IRS Schedule K-1 for 2017 and 2018, which set forth Investor-2's ownership stake in Fraud Guarantee.

**C.    Investor-3**

59.    In March 2013, Investor-3 and Fraud Guarantee entered into a convertible note with a principal balance of $550,000.  Investor-3 invested approximately $200,000 over the course of 2013 pursuant to this convertible note.

60.    The convertible note purported to accrue interest on the principal balance at an annual rate of 8%.

61.    The convertible note provided terms by which Investor-3 was entitled to convert the remaining balance of the note into membership interests in Fraud Guarantee (at the time, Strategic).

62.    Finally, the convertible note stated on the first page that the note was not registered with the Commission pursuant to the Securities Act or any state securities laws.

63.    Correia signed the convertible note on behalf of Fraud Guarantee.

64.    Defendants spoke and emailed with Investor-3 about the investment opportunity and provided Investor-3 with the payment information for Account-1 to which Investor-3 sent Investor-3's investments in Fraud Guarantee.

65.    Correia emailed a copy of a business plan for Fraud Guarantee to Investor-3 on September 18, 2013.  This business plan contained each of the statements attributed to Fraud Guarantee's business plans described in this Complaint.

66.    In 2016, Investor-3 converted Investor-3's notes into membership interests in Fraud Guarantee Holding, LLC.  Thereafter, Correia sent Investor-3 an IRS Schedule K-1 for 2017 and 2018, which set forth Investor-3's ownership stake in Fraud Guarantee.

**D.    Investor-4**

67.    In October 2015, Investor-4 and Fraud Guarantee entered into a convertible loan agreement with a principal balance of $300,000.  Investor-4 invested approximately $300,000 in Fraud Guarantee over the course of late 2015 and 2016 pursuant to this convertible loan agreement.

68.     The convertible loan agreement purported to accrue interest on the principal balance at an annual rate of 8%.

69.     The stated purpose of the convertible loan agreement between Investor-4 and Fraud Guarantee was "to provide for certain approved costs for the development, staffing, promotion, sales and marketing arrangements, and operation of the Business (collectively the 'Business Investment'). The Loan shall be fully reserved and committed for the costs to complete the funding of the Business Investment with the proceeds of the Loan."

70.     The convertible loan agreement provided terms by which Investor-4 was entitled to convert the remaining principal balance into membership interests in Fraud Guarantee, LLC.

71.     Investor-4 represented in the convertible loan agreement that Investor-4 was an "accredited investor" as defined by Securities Act Rule 501 of Regulation D.

72.     Investor-4 also represented that Investor-4

> understands and agrees that the Loan and the potential Conversion Percentage are characterized as "restricted securities" under the federal securities laws, inasmuch as the Loan is being made and funded in a transaction not involving a public offering and that under such laws and applicable regulations the Loan and the Percentage Interest in the Borrower may be resold without registration under the [Securities Act] only in certain limited circumstances.

73.     Parnas signed the convertible loan agreement with Investor-4 on behalf of Fraud Guarantee.

74.     Defendants spoke and emailed with Investor-4 about the investment opportunity and provided Investor-4 with the payment information for another bank account ("Account-2"), to which Investor-4 sent Investor-4's investments in Fraud Guarantee.

75.     Parnas was the sole signatory on Account-2.

76.     Correia emailed a copy of a business plan for Fraud Guarantee to Investor-4 on September 6, 2015. This business plan contained each of the statements attributed to Fraud Guarantee's business plans described in this Complaint.

77.     In March 2016, Investor-4 terminated the convertible loan agreement and entered into a new membership interest purchase agreement whereby Investor-4 agreed to purchase 300,000 units of membership interests in Fraud Guarantee, LLC, or 3% of the outstanding membership interests of the company, directly from Parnas, for a price of $300,000.

78.     In the March 2016 membership interest purchase agreement, Investor-4 represented that Investor-4 was acquiring the membership interests "for its own account for investment purposes and not with a view to, or for offer or sale in connection with, any distribution thereof." Investor-4 further acknowledged that the membership interests being purchased were not registered under the Securities Act and that Investor-4 was an "accredited investor" as defined by Securities Act Rule 501 of Regulation D.

79.     Parnas signed the March 2016 membership interest purchase agreement with Investor-4.

**E.     Investor-5**

80.     Defendants contacted Investor-5, a friend of Parnas, and solicited him to invest in Fraud Guarantee in early 2016.

81.     Correia, copying Parnas, emailed a copy of a business plan for Fraud Guarantee to Investor-5 on February 5, 2016.  This business plan contained each of the statements attributed to Fraud Guarantee's business plans described in this Complaint.

82.     In March 2016, Investor-5 entered into a membership interest purchase agreement whereby Investor-5 agreed to purchase 250,000 units of membership interests in Fraud Guarantee Holdings, LLC, or 2.5% of the outstanding membership interests of the company, directly from Parnas for a price of $250,000.  Investor-5 invested approximately $250,000 in Fraud Guarantee over the course of 2016 pursuant to this membership interest purchase agreement.

83.     In the March 2016 membership interest purchase agreement, Investor-5 represented that Investor-5 was acquiring these membership interests "for its own account for investment purposes and not with a view to, or for offer or sale in connection with, any distribution thereof." Investor-5 further acknowledged that the membership interests being purchased were not registered under the Securities Act and that Investor-5 was an "accredited investor" as defined by Securities Act Rule 501 of Regulation D.

84.     Parnas signed the March 2016 membership interest purchase agreement with Investor-5.

85.     Parnas provided Investor-5 with the payment information for a personal bank account held in the name of Parnas and his wife ("Account-3") to which Investor-5 sent Investor-5's payments for the Fraud Guarantee membership interests.

86.     After Investor-5 made this investment, Correia sent Investor-5 an IRS Schedule K-1 for 2017 and 2018, which set forth Investor-5's ownership stake in Fraud Guarantee.

**F.     Investor-6**

87.     In October 2016, Defendants spoke with and emailed Investor-6 to solicit Investor-6's investment in Fraud Guarantee.

88.     Correia, copying Parnas, emailed a copy of a business plan for Fraud Guarantee to Investor-6 on October 10, 2016, prior to Investor-6's investment. This business plan contained each of the statements attributed to Fraud Guarantee's business plans described in this Complaint.

89.     Thereafter, in October 2016, Investor-6 entered into a membership interest purchase agreement whereby Investor-6 agreed to purchase 300,000 units of membership interests in Fraud Guarantee Holdings, LLC, or 3.0% of the outstanding membership interests of the company, directly from Parnas for a price of $300,000. Investor-6 invested approximately $300,000 in Fraud Guarantee in October 2016 pursuant to this membership interest purchase agreement.

90.     In the October 2016 membership interest purchase agreement, Investor-6 represented that Investor-6 was acquiring these membership interests "for its own account for investment purposes and not with a view to, or for offer or sale in connection with, any distribution thereof."  Investor-6 further acknowledged that the membership interests being purchased were not registered under the Securities Act and that Investor-6 was an "accredited investor" as defined by Securities Act Rule 501 of Regulation D.

91.     Correia explained to Investor-6 and Investor-6's employees the meaning of various provisions and terms in the October 2016 membership interest purchase agreement, including the meaning of the term "accredited investor."

92.     Parnas signed the October 2016 membership interest purchase agreement with Investor-6.

93.     Defendants provided Investor-6 with payment information for Account-2, to which Investor-6 sent Investor-6's payment for the Fraud Guarantee membership interests.

94.     After the investment, Correia sent Investor-6 an IRS Schedule K-1 for 2017 and 2018, which set forth Investor-6's ownership stake in Fraud Guarantee.

**G.     Investor-7**

95.     Defendants solicited Investor-7 to invest in Fraud Guarantee in September 2018.

96.     Investor-7 became interested in investing in Fraud Guarantee because of Parnas's connections to well-known political figures.

97.     In September 2018, Investor-7 and Fraud Guarantee entered into at least two separate convertible notes with principal balances totaling $500,000.

98.     Investor-7 invested $500,000 in Fraud Guarantee in September and October 2018, by wiring payments totaling $500,000, at the direction of Defendants, to the bank account of a Manhattan-based consulting firm that Fraud Guarantee had purportedly retained.

99.     Each of these convertible notes purported to accrue interest on the principal balance at an annual rate of 7%.

100.     Each of these convertible notes provided terms by which Investor-7 was entitled to convert the remaining balance of the note into membership interests in Fraud Guarantee (at the time, Fraud Guarantee Holdings, LLC).

101.     Finally, each of these convertible notes stated on the first page that the notes were not registered with the Commission pursuant to the Securities Act and were subject to various restrictions on resale.

102.     Correia signed each of these convertible notes on behalf of Fraud Guarantee.

III.     **DEFENDANTS DEFRAUDED INVESTORS IN FRAUD GUARNATEE**

103.     Contrary to the representations they made to investors, Defendants used hundreds of thousands of dollars from the money they raised from investors in Fraud Guarantee to pay for personal rather than business expenses.

104.     Defendants represented, both orally and in their marketing materials, that they would use—and, in fact, had used—investor funds for business expenses, including the business plans Defendants sent to potential investors.

105.     Defendants also represented to potential investors that Defendants would not be—and, in fact, had not been—taking salaries or distributions, and would pay all of their own expenses.

106.     Defendants further represented to potential investors through the Fraud Guarantee business plans they sent that prior investor funds raised by Fraud Guarantee had been used for legitimate business expenses.

107.     In reality, since 2013, Defendants compensated one or both of themselves each time an investor deposited funds as a result of an investment in Fraud Guarantee by using a portion of those funds to pay their personal expenses.

108.    For example, between August 26, 2013, and September 19, 2013, Fraud Guarantee received a total of $70,000 in investment payments from Investor-3.  Of this amount, Defendants withdrew more than $41,000 in cash and transferred $10,000 to a personal bank account in the name of Parnas and his wife.

109.    On December 1, 2015, Fraud Guarantee received a $50,000 investment payment from Investor-4.  Of this amount, Defendants used more than $38,000 to pay personal expenses, including:  (a) nearly $15,000 spent at high-end resorts, restaurants, and clothing boutiques; (b) $3,200 spent at a Miami art gallery; (c) $2,500 paid to a real estate agent; (d) more than $4,500 transferred to bank accounts in the name of Parnas or his family members, and (e) $13,600 withdrawn in cash.

110.    On February 3 and 8, 2016, Fraud Guarantee received a $50,000 investment payment from Investor-5 and a $30,000 investment payment from Investor-4, respectively.  Of this combined total of $80,000, Defendants used more than two-thirds to pay for personal expenses, including: (a) nearly $9,000 at luxury clothing stores; (b) approximately $5,400 disbursed at a casino; (c) more than $5,000 spent on travel and hotels; (d) $3,000 transferred to Correia's wife's personal bank account; (e) $2,500 paid to a real estate agent; and (f) nearly $32,000 withdrawn in cash.

111.    On October 14, 2016, Fraud Guarantee received a $300,000 investment payment from Investor-6.  Of this amount, Defendants used more than two-thirds of the funds to pay for personal expenses, including:  (a) approximately $16,400 spent on jewelry and clothes; (b) $50,000 spent on a political contribution; (c) $25,000 transferred to Correia's wife's personal bank account; (d) approximately $13,700 spent at nightclubs and restaurants; (e) $10,000 paid to a real estate agent; (f) $14,500 spent on luxury cars; (g) approximately $1,700 disbursed at a casino; (h) more than $30,000 spent on travel, including $10,000 on private jets; (i) approximately $25,000 spent on various other personal expenses like furniture and utilities; and (j) nearly $30,000 withdrawn in cash.

112.    Defendants knew or recklessly disregarded that their use of investor funds for personal expenses was not consistent with the representations they had made to investors about how their investments would be used—that is, to fund the purported business operations of Fraud Guarantee.

113.    Knowing that their conduct contravened their prior statements, in 2017, when investors began to ask questions about how Fraud Guarantee had used their investments, Defendants falsely stated that they had not taken salaries and had covered all expenses themselves.

114.    For example, in March 2017, when Investor-3 sought repayment of Investor-3's investment in Fraud Guarantee and asked how the company was "functioning without any funds," Correia falsely told Investor-3 that "[w]e take no salaries and cover all expenses ourselves . . . not easy . . . but it's what we have to do at this point to get us to the promised land."

115.    Similarly, in June 2017, Investor-6 sent Fraud Guarantee a demand letter seeking information concerning Investor-6's investment in Fraud Guarantee, including certain financial information.

116.    In response, Correia, on behalf of Fraud Guarantee, falsely stated to Investor-6 that "no wages, consulting fees, distributions, or otherwise, have been paid to any managers or members since the inception of [Fraud Guarantee Holdings, LLC]."

117.    Defendants also defrauded potential investors in Fraud Guarantee by falsely representing both how much money they had raised for the company and how much money they had personally invested in the company.

118.    Based on the Commission's review of the documents it has collected to date, Defendants did not make any personal investments in Fraud Guarantee at all.  To the extent Defendants transferred cash into Fraud Guarantee bank accounts, those funds appear to have been later used to pay Defendants' own personal expenses.

119.     Defendants sought to induce Investor-4's investment in Fraud Guarantee in late 2015 by representing to Investor-4, falsely, that Parnas had personally invested millions of dollars in Fraud Guarantee.  As Defendants well knew, Parnas had not invested any funds in Fraud Guarantee, let alone millions of dollars, as of late 2015.

120.     In early 2016, prior to Investor-5's investment, Defendants sent Investor-5 a "Capital Table" that showed that Parnas had invested as much as $1.1 million in Fraud Guarantee and that Correia had invested $143,000.  In reality, as Defendants knew, Defendants had not made any such capital contributions to Fraud Guarantee as of early 2016 and, in fact, had made none at all.

121.     In an email on October 11, 2016, prior to Investor-6's investment, Correia falsely stated to Investor-6 that "[t]here was 'significant' investment from all parties in order to take ownership" in Fraud Guarantee, "equated to several million dollars invested."  In fact, as Correia knew, Fraud Guarantee had not raised "several million dollars" by October 2016—it had raised approximately $1.3 million—nor had "all parties," such as Defendants, made "significant" investments, because Defendants had not invested any of their own capital in Fraud Guarantee.

122.     On September 18, 2018, Investor-7 asked Correia to tell him "how much money . . . has been invested in this company so far overall."  Correia replied:  "Millions, man.  I don't misspeak.  $4 or $5 million probably."  Correia's statement was false because, as Correia well knew, Fraud Guarantee had raised no more than $1.6 million by that time, which he and Parnas had largely used to pay for personal expenses.

123.     Correia also falsely stated during this conversation with Investor-7 that Correia had "some of my money" invested in Fraud Guarantee, that Parnas had invested in Fraud Guarantee previously, and that Parnas would likely invest an additional $250,000 alongside Investor-7 to pay the purported consultant.  In reality, Defendants had made no such personal investments in Fraud Guarantee.

## FIRST CLAIM FOR RELIEF
### Violations of Securities Act Section 17(a)
### (Both Defendants)

124.     The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 123.

125.     Defendants, directly or indirectly, singly or in concert, in the offer or sale of securities and by the use of the means or instruments of transportation or communication in interstate commerce or the mails, (i) knowingly or recklessly have employed one or more devices, schemes or artifices to defraud, (ii) knowingly, recklessly, or negligently have obtained money or property by means of one or more untrue statements of a material fact or omissions of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (iii) knowingly, recklessly, or negligently have engaged in one or more transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

126.     By reason of the foregoing, Defendants, directly or indirectly, singly or in concert, have violated and, unless enjoined, will again violate Securities Act Section 17(a) [15 U.S.C. § 77q(a)].

## SECOND CLAIM FOR RELIEF
### Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder
### (Both Defendants)

127.     The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 123.

128.     Defendants, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly have (i) employed one or more devices, schemes, or artifices to defraud, (ii) made one or more untrue statements of a material fact or omitted to state one or more material facts necessary in order to make the

statements made, in light of the circumstances under which they were made, not misleading, and/or (iii) engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

129.   By reason of the foregoing, Defendants, directly or indirectly, singly or in concert, have violated and, unless enjoined, will again violate Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### THIRD CLAIM FOR RELIEF
### Violations of Exchange Act Section 15(a)
### (Both Defendants)

130.   The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 123.

131.   Defendants, natural persons not associated with a broker or dealer which is a person other than a natural person, made use of the mails or any means or instrumentality of interstate commerce to effect transactions in, or to induce or attempt to induce the purchase or sale of, any security without being registered with the Commission as a broker-dealer.

132.   By reason of the foregoing, Defendants violated, and, unless enjoined, will again violate Exchange Act Section 15(a) [15 U.S.C. § 78o(a)].

### PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter a Final Judgment:

### I.

Permanently enjoining Parnas and his agents, servants, employees, and attorneys and all persons in active concert or participation with any of them from violating, directly or indirectly, Exchange Act Sections 10(b) and 15(a) [15 U.S.C. §§ 78j(b) and 78o(a)] and Rule 10b-5 promulgated thereunder [17 C.F.R. § 240.10b-5] and Securities Act Section 17(a) [15 U.S.C. § 77q(a)];

**II.**

Permanently enjoining Correia and his agents, servants, employees and attorneys and all persons in active concert or participation with any of them from violating, directly or indirectly, Exchange Act Sections 10(b) and 15(a) [15 U.S.C. §§ 78j(b) and 78o(a)] and Rule 10b-5 promulgated thereunder [17 C.F.R. § 240.10b-5] and Securities Act Section 17(a) [15 U.S.C. § 77q(a)];

**III.**

Ordering Defendants to disgorge all ill-gotten gains they received directly or indirectly, with prejudgment interest thereon, as a result of the alleged violations, pursuant to 15 U.S.C. § 78u(d)(5) and Sections 6501(a)(1) and (a)(3) of the National Defense Authorization Act for Fiscal Year 2021, Pub. L. No. 116-283, to be codified at 15 U.S.C. §§ 78u(d)(3) and 78u(d)(7);

**IV.**

Ordering Defendants to pay civil monetary penalties under Securities Act Section 20(d) [15 U.S.C. § 77t(d)] and Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)]; and

## V.

Granting any other and further relief this Court may deem just and proper.

Dated:  New York, New York
        February 4, 2021

                                        /s/ Richard R. Best
                                        RICHARD R. BEST
                                        REGIONAL DIRECTOR
                                        Sanjay Wadhwa
                                        Sheldon L. Pollock
                                        John O. Enright
                                        Lee A. Greenwood
                                        Lindsay S. Moilanen
                                        Attorneys for Plaintiff
                                        SECURITIES AND EXCHANGE COMMISSION
                                        New York Regional Office
                                        Brookfield Place
                                        200 Vesey Street, Suite 400
                                        New York, New York 10281-1022
                                        212-336-1060 (Greenwood)
                                        GreenwoodL@sec.gov